UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MULL-IT-OVER PRODUCTS, LLC,

        Plaintiff,

v.                                                                              Case No. 1:18-cv-414

TITUS CONSTRUCTION GROUP, INC.,                       Honorable Hala Y. Jarbou

        Defendant.
_____/

## **OPINION**

This is a diversity action. Plaintiff Mull-It-Over Products, LLC, located in Grandville, Michigan, makes components that diminish noise in glass buildings. Defendant Titus Construction Group, Inc., a Florida corporation, agreed to purchase some of those components for installation in a Fort Lauderdale, Florida, construction project on which it was working as a drywall-installation subcontractor. Mull-It-Over claims that it sent four shipments of product to the job site, but Titus has not paid anything in return. Before the Court is Mull-It-Over's motion for summary judgment. (ECF No. 65.) Titus responded to the motion and then Mull-It-Over filed a reply, offering new evidence in support of the motion. (*See* Reply, ECF No. 70.)

The Court heard oral argument on the motion at a hearing on December 2, 2020. After the hearing, the Court gave Titus an opportunity to respond to the evidence that Mull-It-Over had provided in its reply brief. Titus has done so by filing a sur-reply. (*See* Sur-Reply, ECF No. 78.) Having reviewed the parties' submissions, the Court will grant the motion in part.

### **I. Background**

Moss & Associates, LLC, was the general contractor for a large residential condominium development in Fort Lauderdale. It hired Titus to furnish labor and materials for "Drywall & Metal

Framing Work." (Moss-Titus Subcontract, ECF No. 28-1, PageID.414.) The contract specified Mull-It-Over's trim caps as part of the materials that Titus would provide and install. (Subcontract Change Order 4, ECF No. 66-1, PageID.758.) In May 2017, Titus signed a purchase order for 386 custom-fabricated mullion trim caps from Mull-It-Over. (Purchase Order, ECF No. 28-2, PageID.525.) The order provided that Mull-It-Over would ship the product "F.O.B."[1] at its shipping dock in Grand Haven, Michigan, with "[t]itle to each shipment of [g]oods and risk of loss thereon" passing to Titus upon Mull-It-Over's delivery to a common carrier. (*Id.*, PageID.526.)

Mull-It-Over claims that it made four shipments of trim caps to the job site in Fort Lauderdale. The first one arrived on August 7, 2017, the second on August 23, 2017, the third on September 28, 2017, and the fourth on October 12, 2017. Mull-It-Over invoiced Titus for the price of each shipment, in accordance with the purchase order. The total amount of the invoices is $394,645.77.

Titus did not pay the invoices, so Mull-It-Over brought an action against Titus in Kent County Circuit Court, asserting the following claims: breach of contract; account stated; violation of the Michigan Builders' Trust Fund Act; conversion under common law; and statutory conversion. (Compl., ECF No. 1-1.) Titus removed the action to this Court based on diversity jurisdiction. The Court subsequently granted Titus' motion to dismiss all claims in the complaint other than the claims for breach of contract and account stated. Mull-It-Over now seeks summary judgment on its claim for breach of contract. As relief, it seeks damages totaling $717,570.58,

---

[1] As the Court of Appeals has explained:

> "FOB," meaning "free on board" is a delivery term which indicates what transportation costs and risks the dealer must assume. "FOB dealer" means that the dealer is responsible for getting the goods to a common carrier; "FOB user" means that the dealer is responsible for getting the goods to the user.

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 526 n.1 (6th Cir. 2008).

2

"plus post-judgment interest, attorneys' fees and costs of collection." (Br. in Supp. of Mot. for Summ. J. 6, ECF No. 66.) That sum includes the following: (1) the unpaid contract balance of $394,645.77; (2) interest on the unpaid contract balance, which is $220,165.01 as of January 9, 2020; (3) attorney fees recoverable under the contract in the amount of $99,963.69; and (4) collection costs recoverable under the contract in the amount of $3,011.11.

## II. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## III. Analysis

### A. Breach of Contract

Mull-It-Over claims that Titus breached their contract for the purchase of trim caps. "Under Michigan law, a valid breach-of-contract claim must establish three elements: (1) the existence of a contract; (2) a breach of that contract; and (3) damages suffered by the nonbreaching party as a result of the breach." *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018). Mull-It-Over has proven all three of these elements.

#### 1. Existence of a contract

There is no dispute about the existence of a valid contract between Mull-It-Over and Titus. Titus agreed to purchase 386 mullion trim caps under the terms of a purchase order. (*See* Purchase Order, ECF No. 28-2, PageID.525.) Titus' project manager was Leo Guzman. (Pardue Dep. 9,

ECF No. 66-11.) Guzman signed the purchase order. (Def.'s Suppl. Resp. to Interrog. No. 14, ECF No. 66-10.)

### 2. Breach of the contract

There is also no genuine dispute that Titus breached the contract. Mull-It-Over fulfilled its end of the bargain by shipping the product, but Titus did not pay for the product as required by the purchase order. Titus contends that there is a dispute about the number of trim caps contained in the first two shipments. (Def.'s Resp. in Opp'n to Summ. J. 3, ECF No. 69.) Titus offers the declaration of its President, Nathan Pardue, who asserts the following: "Plaintiff did not deliver to Titus the complete order"; "Titus disputes [that] the first shipment contained 162 mullion trim caps"; "Titus disputes that the second shipment contained 100 mullion trim caps. Titus is unaware what was in these shipments as they were not received or signed for by Titus personnel"; and "Titus did not take possession of the third and fourth shipments at all." (Suppl. Pardue Decl. ¶¶ 6, 8-10, ECF No. 78-1.) Guzman makes the exact same averments in his own declaration. (Guzman Decl. ¶¶ 7, 9-11, ECF No. 78-2.)

These declarations do not create a factual dispute, for several reasons. Asserting that Titus "disputes" a fact simply iterates Titus' litigating position; it is not evidence that creates a factual dispute. Moreover, Pardue's statements concerning the quantity of trim caps in the shipments are not admissible because they are not based on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4) (requiring that affidavits and declarations opposing a motion for summary judgment be "based on personal knowledge"). Pardue testified that he was never physically present at the project site and had no personal knowledge about whether Mull-It-Over delivered anything to the site. (Pardue Dep. 17, 23-24, ECF No. 70-4.) That being the case, he could not have known how many shipments were delivered to the site or how many trim caps were in each shipment.

Similarly, even if Guzman was present on the site, he provides no basis for "disputing" the quantity of trim caps in the shipments.  He contends that Titus needed some of the trim caps for the "North Tower" and some for "South Tower cabanas."  (Guzman Decl. ¶ 9.)  At the time of the first two shipments, Titus was  "only working on the North Tower . . . so it was clear we did not need the full shipment of caps as [Mull-It-Over] claimed they shipped." (*Id.*)  Titus' need, or lack thereof, for Mull-It-Over's trim caps has no bearing on whether Mull-It-Over delivered them as ordered.

In addition, Titus' failure to take possession of the trim caps at the project site is irrelevant.  The purchase order required Mull-It-Over to deliver the trim caps to a common carrier at its dock in Grand Haven, Michigan.  The agreement did not require Mull-It-Over to ensure that Titus would receive the shipments at the project site.  To the contrary, the order put the risk of non-delivery on Titus.  Thus, after Mull-It-Over turned over the product to a common carrier for delivery to the project site, it fulfilled its obligations and Titus became liable for payment, whether the trim caps arrived at the site or not.

Furthermore, there is no genuine dispute that Mull-It-Over did, in fact, send all 386 trim caps and that they arrived at the project site.  The person at Moss responsible for overseeing the construction at the project site, Alex Smith, Jr., avers that "386 Trim Caps were delivered to the Project" and were "installed into the Project."  (Smith Decl. ¶¶ 9, 16, ECF No. 70-3.)  Titus offers no evidence to counter Smith's declaration.

Titus takes issue with some of the freight bills and a driver's log that Mull-It-Over has submitted as evidence of delivery of the trim caps to the project site.  Titus contends that these documents are inadmissible hearsay because they have not been authenticated.  Mull-It-Over responds by offering a declaration from an employee of the shipping company to authenticate these

5

documents (Decl. of Jose Iglesia, ECF No. 70-2), but that authentication is unnecessary for purposes of the motion for summary judgment because the Court need not rely on these documents to find in Plaintiff's favor. The other evidence mentioned above is sufficient for Mull-It-Over to establish that it fulfilled its obligations under the contract. Moss confirmed that the trim caps were delivered and installed, and there is no evidence to the contrary. Accordingly, as there is no dispute that Mull-It-Over delivered the trim caps and Titus did not pay for them, there is no dispute that Titus breached the contract.

### 3. Damages from breach

Finally, there is no genuine dispute that Mull-It-Over has been harmed by Titus' failure to pay for trim caps that Mull-It-Over fabricated and shipped in accordance with the purchase order. Thus, Mull-It-Over has proven all the elements of its claim for breach of contract. What remains is to determine the amount and type of damages to which it is entitled.

### B. Damages

As discussed above, Mull-It-Over seeks to recover the amount which it is owed under the purchase order, as well as interest, attorney fees, and costs. In addition to requiring Titus to pay the purchase price for the trim caps, the purchase order provides that Mull-It-Over can add a "service charge of 2% per month (or the maximum legal amount, if less)," accruing from the due date of any unpaid invoices. (Purchase Order, PageID.526.) And where, as here, Titus has defaulted on its obligations, the purchase order makes Titus liable for "all damages incurred by [Mull-It-Over], including reasonable profits, costs, and actual attorney fees in any proceeding to enforce its remedies." (*Id.*, PageID.528.)

### 1. Invoice price

Titus asks the Court to disregard Mull-It-Over's invoices as evidence of damages because the invoices are not authenticated. In response, Mull-It-Over provides a declaration from its

President, Bruce Burgess, that he has "personal knowledge" of the facts in the declaration and that the invoices attached to his affidavit are "true and correct copies" of the invoices related to Mull-It-Over's shipments to Titus.  (Burgess Decl. ¶ 6, ECF No. 70-1, PageID.845.)  The four invoices combined add up to $394,645.77. (Invoices, ECF No. 70-1, PageID.959-962.)  At the motion hearing, Titus conceded that Mull-It-Over had authenticated the invoices.  Accordingly, Mull-It-Over is entitled to $394,654.77 in damages, subject to any affirmative defenses by Titus.

### 2. Interest

Mull-It-Over also seeks interest accruing on the unpaid invoices at a rate of 2% per month. (*See* Interest Calculation, ECF No. 66-14.)  Titus does not raise any objections to this calculation.

### 3. Attorney Fees and Costs

Mull-It-Over seeks approximately $100,000 in attorney fees and costs associated with this litigation.  This request is supported by an affidavit from counsel that "Plaintiff has incurred attorneys' fees with the undersigned firm in the amount of $99,693.69 and costs associated with this litigation in the amount of $3,066.11."  (Rysberg Aff., ECF No. 66-13.)

Titus objects, contending that the provision in the purchase order providing for attorney fees is invalid because it violates the "American Rule," according to which "attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract," citing *Reed v. Reed*, 693 N.W.2d 825, 845 (Mich. Ct. App. 2005).  As the foregoing language in *Reed* indicates, Michigan courts recognize an exception to the American Rule where a contract expressly allows the recovery of attorney fees.  Here, attorney fees are expressly allowed by the terms of the agreement between the parties (i.e., the purchase order), so the American Rule is not an obstacle to recovery of those fees.

Titus contends that a contractual provision for attorney fees must specify that the fees are for a "prevailing party," citing *Fleet Business Credit, LLC v. Krapohl Ford Lincoln Mercury Co.*,

7

735 N.W.2d 644, 647 (Mich. Ct. App. 2007), but this assertion is meritless because Michigan law contains no such limitation. *See McAuley v. Gen. Motors Corp.*, 578 N.W.2d 282, 285 n.7 (Mich. 1998) ("Attorney fees may . . . be awarded where provided by contract of the parties[.]").

Titus also contends that the amount of fees and costs sought by Mull-It-Over are unreasonable and unsupported. Although the purchase order allows for recovery of "actual" attorney fees, courts have indicated that attorney fee awards should be reasonable. *See Papo v. Aglo Rests. of San Jose, Inc.*, 386 N.W.2d 177, 183 (Mich. Ct. App. 1986). ("[W]hen a contract specifies that a breaching party is required to pay the other side's attorney fees, only reasonable, not actual, attorney fees should be awarded.") The Court agrees that additional evidence is needed to determine the reasonableness of the fees and costs. Mull-It-Over has provided an amount without providing details about the hours expended or the rates charged by its attorneys. However, Mull-It-Over contends that, if the Court grants summary judgment, it will submit a motion under Rule 54(d)(2)(a) to provide the analysis necessary to determine whether the amount of fees and costs requested by Mull-It-Over is reasonable. Accordingly, for the time being, the Court finds that Mull-It-Over is entitled to its reasonable attorney fees and costs. The Court will determine the amount of those fees and costs at a later date.

### C. Mitigation

Titus raises the affirmative defense of mitigation. "Generally, whether in contract or tort, an injured party 'must make every reasonable effort' to minimize the damages they suffer. *Trierweiler v. Varnum, Riddering, Schmidt & Howlett, L.L.P.*, No. 256511, 2006 WL 1161546, at *8 (Mich. Ct. App. May 2, 2006) (quoting *Williams v. Am. Title Ins. Co.*, 269 N.W.2d 481, 486 (Mich. 1978)). Specifically, Titus asserts that Mull-It-Over continued to ship its products even "after learning that Titus would not be making payment." (Def.'s Resp. in Opp'n to Mot. for Summ. J. 4.) Mull-It-Over's first invoice, dated July 31, 2017, was due at the end of August, but

Titus did not pay it.  (*See* 7/31/2017 Invoice, ECF No. 70-1, PageID.959.)  In addition, Pardue told Mull-It-Over over the telephone in September 2017 that "there were issues on the job" and that "the general contractor would be paying [Mull-It-Over] direct."  (Pardue Decl. ¶ 14, ECF No. 69-1.)  Pardue reiterated this message in an email to Mull-It-Over on October 19, 2017.  (*Id.* ¶ 15.)  The following day, he told Mull-It-Over's President that Mull-It-Over should "protect itself by filing a notice to the owner to preserve its lien rights on the project."  (*Id.* ¶ 16.)  Despite these warnings, Mull-It-Over "made additional shipments valued at $126,798.59."  (*Id.* ¶ 19.)  Mull-It-Over also failed to preserve its lien rights or to file notice of a claim against the bond held by the contractor or owner of the project.  Thus, Titus claims that Mull-It-Over failed to mitigate $126,798.59 in damages.

Titus contends that the Court should deny summary judgment because Mull-It-Over did not address this defense in its motion, but this argument is only partially correct.  The Court cannot enter a *final* judgment against Titus without adjudicating its affirmative defense, but the Court can grant summary judgment on at least some of the issues presented by Mull-It-Over, such as whether Titus is liable for breach of contract and whether the contract requires Titus to pay Mull-It-Over's attorney fees.  *See Stillman v. Travelers Ins. Co.*, 88 F.3d 911, 914 (11th Cir. 1996) (noting that a final judgment adjudicates "the whole subject matter of the litigation," and concluding that a district court's ruling on the plaintiff's summary judgment motion was a *partial* judgment because it did not address the defendant's affirmative defense).  Titus' mitigation defense potentially reduces the amount of damages that Mull-It-Over can recover, but it does not impact the Court's determination that Titus breached a contract and is liable for damages due to that breach.

On the other hand, the Court agrees with Titus that Mull-It-Over has not shown that it is entitled to summary judgment on the issue of mitigation.  For one thing, Mull-It-Over did not

9

address the issue in its original motion.  For another, the Court is not persuaded by Mull-It-Over's response to the issue.

Mull-It-Over contends that a lien would have served no purpose because Moss paid Titus for the trim caps.  According to Smith, "Titus requested $387,932 for the Trim Caps" and Moss paid that amount to Titus.  (Smith Decl. ¶¶ 18-19; *see* Pardue Dep. 38, ECF No. 70-5 (acknowledging that Moss paid Titus for Mull-It-Over's products).)  In addition, Pardue conceded in his deposition that when Titus asked for payment from Moss, Titus represented to Moss that Mull-It-Over's products "had been manufactured and delivered to the job site." (Pardue Dep. 38.)  If Moss paid for the trim caps, it is likely that Mull-It-Over would not have been able to recover from Moss or from the owner of the project.

In a supplemental declaration, however, Pardue clarifies that Titus billed Moss for only 65% of the trim caps.  (Suppl. Pardue Decl. ¶ 29.)  Mull-It-Over's evidence does not show otherwise.  Although Pardue testified that Titus billed Moss for the trim caps, he never expressly stated that Titus billed Moss for *all* of the trim caps.  The Court also notes that the amount Titus billed to Moss is roughly $6,000 less than the invoice price for the trim caps.  If, as Mull-It-Over contends, Titus billed Moss for all the trim caps, it is odd that Titus asked for less than what it owed to Mull-It-Over.  In short, the evidence indicates that Moss may not have paid for all the trim caps; thus, it is possible that Mull-It-Over could have recovered some of the amount owed from Moss or from the project owner had Mull-It-Over secured a lien on the project.

But even if securing a lien would have been ineffective, Mull-It-Over provides no response whatsoever to Titus' contention that Mull-It-Over failed to mitigate its damages by stopping shipment of the trim caps after Titus failed to pay its invoice on time and after learning that Titus would not be paying for the trim caps.

Finally, neither party has attempted to explain to the Court in any significant detail what state's law would govern Titus' mitigation defense, and how that law would apply to the facts of this case.

### IV. Conclusion

For all the foregoing reasons, the Court will grant Mull-It-Over's motion for summary judgment in part. Mull-It-Over is entitled to judgment on the following issues: (1) Titus breached a contract between itself and Mull-It-Over; (2) Mull-It-Over is entitled to damages for that breach; and (3) Mull-It-Over's damages will include at least a portion of the invoice price for the trim caps (subject to Titus' mitigation defense), as well as interest at a rate of 2% per month and reasonable attorney fees and costs. Mull-It-Over is not entitled to judgment on Titus' affirmative defense. Nor is it entitled to judgment on the amount of damages it is owed.

An order will enter consistent with this Opinion.

Dated: December 17, 2020          /s/ Hala Y. Jarbou
                                  HALA Y. JARBOU
                                  UNITED STATES DISTRICT JUDGE